***MARTELLE, BRATTON & ASSOCIATES, P.A.***
Martin J. Martelle      ISB No. 3304
Sarah B. Bratton        ISB No. 7771
873 East State Street
Eagle, ID 83616
Telephone:      (208) 938-8500
Facsimile:      (208) 938-8503
E-mail:         sarah@martellelaw.com

Attorney for Debtor(s)

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re: | CHAPTER 11 |
| **CENTRAL ASSEMBLY CHRISTIAN LIFE CENTER,** | Case No. 13-00043-JDP |
| **(A Non-profit 501(c)(3) Organization)** | |
| Debtor(s). | |

**DEBTOR'S CHAPTER 11 DISCLOSURE STATEMENT
DATED OCTOBER 4, 2013**

Central Assembly Christian Life Center ("Debtor"), Debtor-in Possession, through the undersigned counsel, herby submits to his creditors this Disclosure Statement, pursuant to 11 U.S.C. § 1121(e).

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION. PLEASE READ THIS DOCUMENT WITH CARE!

**I.      PRELIMINARY STATEMENT**

The Debtor submits this Disclosure Statement to all of his creditors in order to comply with the provisions of the Code requiring the submission of information

necessary for creditors to arrive at an informed decision in exercising their rights to vote for acceptance or rejection of the Plan, presently on file with the United States Bankruptcy Court for the District of Idaho.

Accompanying this Disclosure Statement are copies of the following documents:

APPENDIX A          Debtor's Schedules A-B.

APPENDIX B          Monthly Projections of Income.

### A.    Identity of Person to Contact for More Information

If you want additional information about the Plan, you should contact Sarah B. Bratton at Martelle, Bratton & Associates, P.A., 873 E. State Street, Eagle, Idaho 83616, or phone at (208) 938-8500 or facsimile at (208) 938-8503 or email sarah@martellelaw.com.

### B.    Disclaimer

The Court must approve this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for Confirmation, and the fact that the Court has approved the Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted.

### II.    SUMMARY OF PLAN AND CODE PROVISIONS FOR VOTING

### A.    Repayment of Creditors

The Plan provides for payment of administrative expenses, priority Claims, and secured creditors in full, either in cash or in deferred cash payments, and provides for a payment to unsecured creditors in an amount greater than they would receive in the event of a Chapter 7 liquidation. Funds for implementation of the Plan will be derived from the Debtor's income.

This Disclosure Statement contains a detailed discussion of the Plan and its implementation. This Disclosure Statement should be read in conjunction with the Plan, which is a legal document and upon confirmation will become binding on the parties. creditors should read the Plan and this Disclosure Statement in their entirety, rather than relying on this summary. The Debtor urges creditors and other parties in interest to consult with independent counsel in connection with their decision to accept or reject the

Plan. Approval of this Disclosure Statement by the Court is not a decision on the merits of the Plan.

<b>B.      Voting Procedures and Confirmation Requirements</b>

<b>1.      Ballots and Voting Deadline</b>

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating and signing the Ballot for Accepting or Rejecting the Plan of Reorganization. Creditors and equity interest holders of the Debtor must (1) carefully review the Ballot and instruction thereon; (2) execute the applicable Ballot; and (3) return the completed Ballot to Martelle, Bratton & Associates, P.A., Attn: Sarah B. Bratton, Esq., 873 E. State St., Eagle, Id. 83616. To be received by 5:00 p.m. on the date specified in the Order approving the Debtor's Disclosure Statement. Ballots received after the deadline will not be considered.

<b>2.      Creditors Entitled to Vote or Object</b>

Any party in interest may object to the Confirmation of the Plan if the party believes that the requirements for Confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a Claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

<b>3.      What is an Allowed Claim or an Allowed Equity Interest?</b>

Only a creditor or equity interest holder with an allowed Claim or an allowed equity interest has the right to vote on the Plan. Generally, a Claim or equity interest is allowed if either (1) the Debtor has scheduled the Claim on the Debtor's Schedules, unless the Claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a Proof of Claim or equity interest, unless an objection has been filed to such Proof of Claim or equity interest. When a Claim or equity interest is not allowed, the creditor or equity interest holder holding the Claim or equity interest cannot vote unless the Court, after Notice and Hearing, either overrules the objection or allows the Claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal

Rules of Bankruptcy Procedure.  ***The deadline for filing a Proof of Claim in this case was May 16, 2013.***

### 4.      Definition of Impairment

As noted above, the holder of an allowed Claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 5.      Classes Impaired Under the Plan

The Plan Proponent believes that classes B, C (consisting of C-1 and C-2) and D are impaired and that holders of Claims in each of these classes are therefore entitled to vote to accept or reject the Plan.

The Plan Proponent believes that Class A (consisting of A-1 and A-2) are unimpaired and that holders of Claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

### 6.      Who is Not Entitled to Vote

The holders of the following types of Claims and equity interests are *not* entitled to vote:

a.   holders of Claims and equity interests that have been disallowed by an order of the Court;

b.   holders of other Claims or equity interests that are not "allowed Claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

c.   holders of Claims or equity interests in unimpaired classes;

d.   holders of Claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;

e.   holders of Claims or equity interests in classes that do not receive or retain any value under the Plan; and

f.   administrative expenses.

### 7.      Who Can Vote in More than One Class

A creditor whose Claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold Claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each Claim.

### 8.   Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot Confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes.

**Votes Necessary for a Class to Accept the Plan** - A class of Claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed Claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed Claims in the class, who vote, cast their votes to accept the Plan. A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

***Treatment of Non-accepting Classes*** - Even if one or more impaired classes reject the Plan, the Court may nonetheless Confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Code. A Plan that binds non-accepting classes is commonly referred to as a "cram down" Plan.

This section provides that the Court may Confirm a Plan notwithstanding its rejection by one or more impaired classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired class which does not accept the Plan. With respect to classes of secured creditors, the *fair and equitable* test requires that a secured creditor (1) retain its lien and receive cash payments having a present value equal to its allowed secured Claim, and (2) receive the proceeds of the sale of its collateral, or (3) realize the indubitable equivalent of its Claim the extent validly secured.

With respect to a class of unsecured Claims, the *fair and equitable* test requires that if each creditor in such class does not receive property having a present value equal to the amount of such creditors allowed Claim, no junior class can receive or retain any property. The Proponent of the Plan will rely on the features of §1129(b) in the event

there is a rejection of the Plan by a class of Claims or interest. Under the Plan the equity security interests will receive nothing until all allowed unsecured Claims are paid pursuant to the Plan. The invocation of the provision of 1129(b) is a legal matter required to be heard by the Court at the Confirmation Hearing or at a Hearing set by the court.

## 9.      Unsecured Creditors' Right to Object

In relevant part, section 1129(a)(15) of the Bankruptcy Code states that if an unsecured creditor objects to the Plan, a Debtor must contribute:

> "the projected disposable income of the Debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the Plan, or during the period for which the Plan provides payments, whichever is longer."

Section 1325(b)(2) defines the term "disposable income" and states that it consists of the Debtor's current monthly income less amounts "reasonably necessary" to be expended for the maintenance or support of the Debtor and/or Debtor's dependents, charitable contributions and "for the payment of expenditures necessary for the continuation, preservation, and operation of Debtor's business. Debtor asserts that the Plan does in fact distribute all of their disposable income.

## 10.      Vote Required for Class Acceptance

Under §1126 of the Bankruptcy Code an impaired class is deemed to have accepted the Plan if (1) at least 2/3 in amount and (2) more than ½ in number of the allowed Claims or interest of class members who have voted on the Plan have voted to accept it. Further, unless there is unanimous acceptance of the Plan by an impaired class, the Bankruptcy Court must also determine that under the Plan such class members will receive property of value, as of the Effective Date of the Plan, that is not less than the amount that such class member would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. Even if all classes of Claims or interest accept the Plan, the Court may refuse to confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and there are other provisions therein which may affect confirmation exclusive of the votes of creditors.

## 11.      Requirements for Confirmation

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code.  These include the requirements that:  the Plan must be proposed in good faith; at least one impaired class of Claims must accept the Plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a Chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible.  These requirements are not the only requirements listed in § 1129, and they are not the only requirements for Confirmation.

## 12. Confirmation Hearing

The Bankruptcy Court will set a Hearing date to determine whether the Plan has or will be accepted and whether the other requirements for Confirmation of the Plan have been satisfied. Notice of the time for Hearing will be provided to each creditor and shareholder. Attendance is not mandatory to establish a Claim. The Confirmation Hearing may be adjourned or continued by the Bankruptcy Court without further notice except for an announcement made of the adjourned or continued date made at the Confirmation Hearing.

At the Confirmation Hearing the Bankruptcy Court Shall determine whether the requirements of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court shall enter an Order Confirming the Plan.

## 13. Consequences of Confirming the Plan

Confirmation makes the Plan binding upon the Debtors, creditors and other parties in interest regardless of whether they have accepted or rejected the Plan. Confirmation of the Plan will, generally, provide for the distribution of value to the creditors as set forth in the Plan.

## III. REQUISITE DISCLOSURES

### A. Representations Limited

No representations concerning the Debtor, particularly regarding future business operations or the value of the Debtor's assets, have been authorized by the Debtor except as set forth in this statement. You should not rely on any other representations or inducements proffered to you to secure your acceptance or rejection in arriving at your decision in voting on the Plan. For various reasons, the records of the Debtor prior to

preparation of the Plan may not have been complete and the accuracy of the information submitted with this statement is dependent on information available to the Debtor with the assistance of counsel. While every effort has been made to provide the most accurate information available, the Debtor is unable to warrant or represent that all information is without inaccuracy. There are no known inaccuracies. While every effort has been made to ensure that the assumptions are valid and as accurate as can be made under the circumstance, neither the Debtor nor his attorneys undertake to certify or warrant the absolute accuracy of the assumptions or projections.

No formal appraisals have been undertaken of the Debtor's property except where stated. The values place thereon and summarized below are the Debtor-in-Possession's best estimate of the value of the property as of the time of the filing of the Plan and this Disclosure Statement. These values may differ from values placed on the same property at the time of filing of the petition for relief and the subsequent Schedules.

### B.    Description and History of Debtor's Business

The Debtor is a Non-Profit Corporation with 501(c)(3) tax-exempt status. It was founded in 1948. Central Assembly Christian Life Center (Central Assembly) owns and operates a non-profit church, preschool, elementary school, food and clothing bank and other related ministries.  It is associated with the Southern Idaho District Council of the Assemblies of God.  The business of Central Assembly is to provide spiritual and social services to its members, the members of the community, and through its outreach programs, provide services in various parts of the world.  Through the schools Christ-centered learning environment is provided based on traditional values and a biblical world view.  Through the food and clothing bank (Operation Love Center) the Church provides emergency help with life essentials such as food, clothing, and sometimes furniture.  Literally thousands of people in the Treasure Valley are being helped in a practical way every year through the ministry of Operation Love Center.

Central Assembly is operated through its Board of Directors, with Pastor Ted Buck, the Lead Pastor of the church, acting as the President of the Board.  Income is derived from member's tithes and offerings, tuitions and fees from the school and preschool, and donations to Operation Love Center.

### C.    History and Events Leading to Bankruptcy

Central Assembly Christian Life Center is a church located near the corner of Fairview and Cloverdale. The church was founded in 1948 and has been a continual part of the community since then. Ministries of the church include Maranatha Christian School and Pre-school, Operation Love Center, a mercy ministry which provides food and clothing to people in need, as well as traditional church ministries.

Central Assembly has been a vital part of the Boise Valley for over sixty (60) years. Its campus is comprised of approximately 12.2 acres with four buildings. As with other entities in the Valley, Central Assembly has been hit hard with the economy. Donations have fallen off, enrollment in both the school and preschool declined. Some of the parents of our students found themselves getting behind in payments owed to its creditors.

Central Assembly Christian Life Center began having problems with the collection of tuition and fees for the pre-school and school. The church tried to work with people, but were faced with a number of them that ended up refusing to pay their bills to the church. There had always been some of this happening with the schools, approximately three years ago the number of non-collectible accounts rose significantly. Accounts Receivable grew and the church was having trouble collecting from its patrons. This caused the church to begin to get behind on Accounts Payable. In addition to that, economy dropped substantially, which was also felt in the church. When people lost their jobs or faced cutbacks, they were not able to give as much to the church. The extended period of time that the economy was floundering became more of a problem. The church found themselves paying bills at the end of the month instead of at the beginning of the month.

The church decided to sell two acres of its ministry campus to another ministry called Teen Challenge. The sale price was $174,000. It was anticipated using proceeds from this sale to catch up to the front of the month and solidify themselves financially. There is a mortgage on the property of $1,310,000. The property is valued at nearly $7,000,000. Central Assembly was shocked and disappointed that the mortgage lender, AG Financial, would not allow them to keep any of the proceeds from the sale. Even though there is a tremendous equity in the property, the mortgage lender insisted that any

net proceeds be applied to the principle.  This made the situation worse, since the money being counted on from the sale to Teen Challenge, would not be available.

Mortgage payments were missed and/or paid late to AG Financial.  The church tried, to no avail, to either restructure or modify the loan and were threatened with foreclose on the property.  The only obligation in arrears was the mortgage with AG Financial.  The church couldn't risk losing what the congregation had worked so hard for and decided to file a Chapter 11 bankruptcy.  This would provide a temporary relief from impending foreclosure and since the church was not behind on anything else, would be able through the filing be allowed to reorganize without losing their campus.

Central Assembly is a viable entity in this community. It is a vital part of the community and continues to be so.  Their income is sufficient with the protection of the court to pay all our current bills, catch up on the amount which they are behind (AG Financial) and continue to be an asset to this community.

### D.      Current Outlook

The enrollment in the school and preschool have stabilized.  Debtors have staffed them accordingly.  They have been much more efficient with the tuition collection process.  The church income via donations and rental donations/fees has stabilized.  They are seeing a regular flow of new people visiting the church who could potentially become a part of the congregation.  With the help and time provided by the Chapter 11, the future for Central Assembly and all its ministries looks bright.

### E.      Procedural Posture of the Bankruptcy Case

On January 10, 2013 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for reorganization relief under Chapter 11 of Title 11 of the U.S. Code (as amended, the "Bankruptcy Code").  The Debtor continues to hold the assets of the estate as a Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

### F.      Assets

The Debtor's Schedules of assets and exemptions (Schedules A and B) are attached as APPENDIX A.

### G.      Trustee

No Trustee or Examiner has been appointed.

**H.**     **Insiders**

There are no insiders of the Debtor.

**I.**     **Creditors Committee**

No Creditors Committee has been formed in this case.

**J.**     **Professionals**

The Debtor has retained the firm of Martelle, Bratton & Associates, P.A. and Sarah B. Bratton as bankruptcy counsel, which appointment has been approved by the Court. Prior to filing the Debtor had paid a retainer fee of $13,713. Martelle, Bratton & Associates, P.A. was paid $8,668.00 for pre-petition work related to this case, and advanced the filing fee of $1,213.00 which were paid prepetition, leaving a balance in retainer of $3,832.00. Martelle, Bratton & Associates, P.A. has filed a Fee Application that was approved on May 3, 2013, for $6,123.35. Of which $3,832.00 was paid from the remaining amount held in Trust and the Debtor has paid an additional $2,291.35 and has a remaining balance of $1,540.65 which Debtor is paying as previously agreed. Martelle, Bratton & Associates, P.A. expects to file a Fee Application shortly. Said fees and costs are subject to court approval.

**K.**     **Officers/Directors and Compensation**

The Board of Central Assembly consists of the following people:

| | |
|---|---|
| Pastor Ted Buck, President | Tom Gould |
| Jerry Tibbetts, Secretary | Jed Thomet |
| Wayne Barber | Ken Thornock |
| Gary Carter | |

None of the Board Members receives any compensation for serving on the Board. If you have additional questions, please let Sarah B. Bratton know.

**L.**     **Bar Date**

The Bar Date for filing of pre-petition Claims against the Debtor was May 16, 2013, with government Claims due by July 9, 2013.

**IV.     CLASSIFICATION AND TREATMENT OF CLAIMS**

The Plan establishes four (4) classes of Claims, plus two categories of unclassified Claims (for administrative expenses and for priority taxes). The classes of Claims are identified and treated as follows:

**Unclassified Claims**

        **A. Administrative Expenses.**   Administrative expense Claims approved and allowed by the Court shall be paid in full, in cash, by the Debtor on the Effective Date of the Plan or as soon thereafter as the amount thereof can be fixed, unless a different treatment is agreed to or provided for in the Plan.  Administrative Claims which by their terms are not due and payable on or before the Effective Date shall be paid as and when due.

        Each holder of an administrative expense Claim allowed under §503 of the Code will be paid in full on the Effective Date of the Plan, in cash, or upon such other terms as may be agreed upon by the holder of the Claim and the Debtor. The total unpaid professional fees as of the date of the Plan are estimated to be approximately $15,000.

        The Debtor is unaware of any other unpaid administrative expense Claims.

        Within this class are all pre-confirmation fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6), which shall be paid on the Effective Date of the Plan, if not paid sooner.  After Confirmation, and until the case is closed, the Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6).

        **B. Priority Taxes (Unclassified).**

        This class includes the Claim of the IRS in the amount of $19,698.28 in the event such Claim is allowed, for income taxes.

        To the extent such Claims exist, such Claims shall be paid in full, with interest at the statutory rate on such Claims, in equal monthly cash payments commencing ninety (90) days after the Effective Date of the Plan, amortized over the remaining period of five (5) years from the petition date, unless a different treatment is agreed to or provided for in the Plan.

        **Classified Claims and Interests**

        **A. Class A (Priority (non-tax) Claims).**   Class A consists of priority Claims under 11 U.S.C. § 507 other than administrative Claims and priority tax Claims.

        Class A-1 (Priority (non-tax) Claims).  Class A-1 consists of priority Claims under 11 U.S.C. § 507 for prepetition wages and insurance. The Debtor is unaware of any such outstanding Claims, and no Proofs of Claim in this class have been filed.  An Order

Authorizing Payment of Prepetition Payroll and to Honor Prepetition Payroll Procedures was entered February 11, 2013 (Docket #39).   All said Claims outstanding were immediately paid upon entry of said Order.

In the unlikely event that there are any allowed Claims in Class A-1, they shall be paid in full, in cash, by the Debtor on the Effective Date of the Plan or as soon thereafter as the amount thereof can be fixed, unless a different treatment is agreed to or provided for in the Plan.  **This class is not impaired.**

Class A-2 (Priority (non-tax) Claims).  Class A-2 consists of priority Claims under 11 U.S.C. § 507 other than those Claims for prepetition wages as part of Class A-1 and other than administrative Claims and priority tax Claims. **This class consists of any other priority non-tax Claims not included in Class A-1.**

**The Debtor is aware of two (2) Claims filed by Nampa and Meridian Irrigation District (Proof of Claim #2 and #3); the Debtor is unaware of any other Claims in this class.**  Allowed Claims in Class A-2 shall be paid in full, in cash, by the Debtor on the Effective Date of the Plan or as soon thereafter as the amount thereof can be fixed, unless a different treatment is agreed to or provided for in the Plan.  **This class is not impaired.**

**B.  Class B Assemblies of God Loan Fund Secured Claim.**
Class B consists of the secured prepetition Claim of Assemblies of God Loan Fund, as Trustee, (Proof of Claim #10), in the amount of $1,481,303.57 as of the filing date, secured by a Deed of Trust on the Debtor's real estate.

The Claim of Assemblies of God Loan Fund, as Trustee, is secured against Debtor's real estate:

Business Location: 12000 W Fairview Ave, Boise ID 83713

Business Location: 1820 Dawn Drive, Boise, ID  83713

5 Buildings Approximately 12 Acres

Lot 1 of Maranatha Subdivision R5459150010 - $3,365,050

Lot 3 of Maranatha Subdivision R5459150030 - $500,000

Said real estate shall be valued under 11 U.S.C. § 506(a) at $3,865,050.00 as of the Effective Date of the Plan. This value is the best estimate of the Debtor based on current tax assessments and real estate comparisons. It should be noted that the creditor,

Assemblies of God Loan Fund has valued the property at $6,051,200.00 in its Proof of Claim. The difference in these values will not have an actual effect on reorganization as the result of a reorganization using either value will have the same effect on creditors. The value set by the Debtor will be the value used throughout this Disclosure Statement and the Plan.

If Assemblies of God Loan Fund disputes the value of the collateral stated above, it must timely file an objection to Confirmation, or the value stated by Debtor will be determined to be the value of the collateral.

The Debtor is currently marketing the property for sale, with the assistance of a real estate agent previously approved by the Court. The Debtor is in the process of attempting to sell all, or a portion, of the current property to satisfy the Claim of Assemblies of God Loan Fund. Any sale of the real estate shall be made based on reasonableness of the offer based on the combined judgment of the Debtor and the real estate agent. The final agreement on sale will be made under reasonable business methods at the approval of the debtor and pursuant to the terms laid out in the Plan.

The Debtor will pay interest only on the total outstanding amount of the Claim equal to $1,481,303.57 for up to five (5) years after the Effective Date of the Plan. The first payment shall be due thirty (30) days after the Effective Date of the Plan Debtor will make equal monthly payments as follows:

Year 1-twelve (12) equal payments of 1% annum on the total outstanding balance calculated on the Effective Date of the Plan.

Year 2-twelve (12) equal payments of 2% annum on the total outstanding balance calculated one year after the Effective Date of the Plan.

Year 3-twelve (12) equal payments of 3% annum on the total outstanding balance calculated two years after the Effective Date of the Plan.

Year 4-twelve (12) equal payments of 4% annum on the total outstanding balance calculated three years after the Effective Date of the Plan.

Year 5-twelve (12) equal payments of 5% annum on the total outstanding balance calculated four years after the Effective Date of the Plan.

The Debtor within five (5) years of the Effective Date of the Plan will either:

1)  Sell the entire real estate currently held by Debtor, for an amount at least equal to the outstanding Claim of creditor, Assemblies of God Loan Fund. In the event that the Debtor is able to procure a sale for the entire amount of the lien the entire outstanding balance of the Claim would be paid in full and the lien released for full satisfaction.

2)  The Debtor may attempt to divide the current real estate and only sell a portion of said real estate. In the event Debtor is able to procure a sale of a portion of the current real estate the creditor, Assemblies of God Loan Fund, shall release its lien for said portion of the real estate, in order to effectuate a sale. Creditor, Assemblies of God Loan Fund, shall be paid the net proceeds of any sale on the property. Creditor, Assemblies of God Loan Fund, will continue to carry a lien on any remaining real property up to the total amount remaining on the Claim.

a.  In the event of a sale on a portion of the currently owned property the total net proceeds will be in ratio to the amount of land being sold and will be at least equal to the percentage of land being sold. For example, if 25% of the real property currently held by Debtor is to be sold, the net proceeds of said sale to be paid to creditor, Assemblies of God Loan Fund, will be at least 25% of the remaining outstanding balance of the Claim.

b.  In the event a sale of this kind takes place, the interest only payment for the remaining amount of the five (5) year term shall be re-calculated and the Debtor shall continue to make payments of the applicable interest amount on the remaining balance of the Claim of creditor, Assemblies of God Loan Fund.

At the expiration of the five (5) year term any remaining balance owed on the Claim of Assemblies of God Loan Fund shall be re-amortized at 5.0% interest for thirty (30) years. Payment will be made in equal monthly installments over the following 360 months. Said payment amount will be amortized at an interest rate of 5.0% per annum, on the total remaining balance of the Claim, plus an escrow deposit for taxes and insurance as provided in the existing loan documents.  **This class is impaired.**

**C.**      **Class C Secured Claim on Personal Property.**  Class C consists of the secured Claim of Syringa Bank and Mountain West Bank (fka Glacier Bank). **This class is impaired.**

Each creditor shall retain its lien on the collateral securing the Claim until the allowed secured Claim is paid in full.  The Debtor will continue to make payments to each creditor in this class at the previously agreed amount until the secured Claim is paid in full including any and all remaining principal, accrued and unpaid interest, and fees due.

Class C-1 (Syringa Bank Secured Claim on Personal Property).  Class C-1 consists of the secured Claim of Syringa Bank, which is secured by a Promissory Note that is properly perfected in a first lien position in regard to all the vehicles of the Debtor, as more specifically described and documented in Proof of Claim #6 filed by creditor. The Claim is in the approximate amount of $26,927.92 as of the filing date. The Claim of Syringa Bank shall be paid pursuant to the final Debt Modification Agreement executed by the Debtor on or about March 1, 2012; except that the final payment will not become due in full on March 10, 2017.  The Debtor will continue to make the regular monthly payment in the amount of $569.45, until the secured Claim is paid in full including any and all remaining principal, accrued and unpaid interest, and fees due.

**This class is impaired.** Class C-1 shall be treated as part of Class C for voting and distribution purposes.

Class C-2 (Mountain West Bank (fka Glacier Bank) Secured Claim on Personal Property).  Class C-2 consists of the secured Claim of Mountain West Bank (fka Glacier Bank), which is secured by a properly perfected and recorded UCC Financing Statement, against personal property located at the primary business location of the Debtor, as more specifically described and documented in Proof of Claim #4 filed by creditor.  The Claim is in the approximate amount of $92,959.00 as of the filing date. The Claim of Mountain West Bank (fka Glacier Bank) shall be paid $1,350 a month due on the 15th day of each month until January 2014, a payment of $1,400 will be due on the 15th day of February 2014. Thereafter a payment of $1,250 will be due by the 15th of each month until the secured Claim is paid in full including any and all remaining principal, accrued and unpaid interest, and fees due. All other provisions of the Security Agreement executed in favor of Mountain West Bank (fka Glacier Bank) prior to the filing of this case shall remain in effect.

**This class is impaired**.  Class C-2 shall be treated as part of Class C for voting and distribution purposes.

      **D.**     **Class D (General Unsecured Claims).**  Class D consists of all general unsecured Claims against the Debtor. Holders of Class D Claims shall be paid, in full in monthly installments including accrued interest at the rate of 3% per annum amortizing the balance including interest over the subsequent sixty (60) months after Confirmation of this Chapter 11 Plan.  *Allowed unsecured Claims shall receive 100% of the amount due*.  **This class is impaired.**

The monthly payment amount of the claimed amount of any Claims which are then subject to objections as to which a final Order has not been entered shall be deposited in an interest bearing bank account until a final Order is entered.  When final Orders are entered disallowing or allowing and liquidating all Class D Claims, the remaining funds in the bank account shall be distributed to the holder of all Class D Claims *pro rata*.  Payments on Class D Claims shall be mailed to the address of the creditor on the Proof of Claim (or, if allowed pursuant to the Schedules, to the address on the Schedules), unless the creditor files a change of address Notice with the Court.  Any check mailed to the proper address and returned by the post office as undeliverable, or not deposited within one-hundred eighty (180) days, shall be void and the funds may be retained by the Debtor.  **This class is impaired.**

      **V.**     **IMPLEMENTATION OF PLAN**

The church will sell a portion of the current real estate that the campus resides on to satisfy in part the secured Claim of Assemblies of God Loan Fund. Additionally the church and school will continue to be operated and it is expected that revenues will be sufficient to fund the Plan.

The Debtor shall fund the Plan from proceeds of the sale of any and all real property, from any rents from real estate and from the regular operating income of the church and school.  The Debtor shall retain the assets of the estate, and shall pay ordinary expenses, pay the operating expenses for the real estate, and the operating expenses of the school and church as well as Operation Love Center, and pay the creditors the amounts set forth in the Plan therefrom.  Consistent with the provisions of the Plan and subject to any releases provided for herein, the Debtor reserves their right to begin or continue any

adversary proceeding permitted under the Code and Rules to collect any debts, or to pursue Claims in any Court of competent jurisdiction. Except as expressly provided for in the Plan, nothing in the Plan shall be deemed to constitute a waiver of any Claim that the Debtor may assert against any other party, including the holder of any Claim provided for in the Plan, and the allowance of any Claim against the Debtor or the estate shall not bar any Claim by the Debtor against the holder of such Claim.

Monthly projection of income and expenses are included in APPENDIX B and show that the Debtor can make the payments required under the Plan.

### VI.   RISK FACTORS

The Plan has the following risks:

The state of the economy is uncertain, if the economy worsens Debtor could face a reduction in membership and donations as well as a reduction in enrolled students in the elementary school and preschool resulting in less tuition income, however said reduction in tuition income could at least in part be offset by a reduction in expenses and salaries for the school.

The value of the property and potential risks associate therewith is also a risk factor. Factors such as zoning laws and property taxes could all have an impact on the ability of the church to market and sell a portion of the current land it owns.

Further, If AG Financial is unwilling to modify the repayment schedule and is unwilling to agree to a release of lien on a portion of the property to be sold, then other creditors would potentially receive less in distribution then they would under the Plan.

### VII.   ANALYSIS OF LIQUIDATION VALUE OF THE ESTATE

Notwithstanding acceptance of the Plan by creditors, in order to Confirm the Plan the Court must independently determine that the Plan is in the best interests of all classes of creditors and stockholders. The "best interest" test requires that the Court find that the Plan provides to each member of each impaired class of Claims and interest a recovery which has a present value at least equal to the present value of a distribution, which each such person would receive from the Debtor if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code instead of being reorganized under Chapter 11 of the Bankruptcy Code.

To calculate what members of each impaired class of unsecured Claims or interest would receive if the Debtor's assets were liquidated, the Court must first determine the dollar amount that would be generated from the disposition or liquidation of the assets of the Debtor in excess of the amount necessary to pay allowed secured Claims, plus the cash held by the Debtor.  The proceeds of this liquidation will then be reduced by the costs of the liquidation. Such a liquidation would probably take place in a Chapter 7 proceeding and such a proceeding would likely include the fees of a Trustee as well as those of counsel and other professionals that might be retained by such Trustee, selling expenses (including costs of advertising and auctioneer's fees or brokerage commissions), unpaid expenses incurred by the Debtor during their reorganization proceedings under Chapter 11, and Claims arising by rejection by the Trustee of obligations incurred by the Debtors during the pendency of the Chapter 11 case.

The liquidation costs and resulting funds available to unsecured creditors is valued by categories most reflective of the nature of the assets, its time or regulatory sensitivity to sale and the costs of liquidating the asset. The "liquidating cost" is based upon the Debtor's counsel consulting with individuals including the Debtor.

Real Property 5 Buildings Approximately 12 Acres

Business Location: 12000 W Fairview Ave, Boise ID 83713

Business Location: 1820 Dawn Drive, Boise, ID  83713

Lot 1 of Maranatha Subdivision R5459150010 - $3,365,050

Lot 3 of Maranatha Subdivision R5459150030 - $500,000

Basis for Valuation:  Tax Assessment - $ 3,865,050.00

Non-exempt Personal Property (less non-collectible Accounts Receivable) $97,349.00.

Liquidation under Chapter 7 would also include fees and costs of liquidation and of the Chapter 7 Trustee, therefore the estimated liquidation amount has been reduced by 25%.  **Estimated Total Chapter 7 Liquidation amount $2,971,799.20.**

Debtor asserts that all creditors would be paid after the secured creditors have taken their collateral if creditors or a Chapter 7 Trustee sold their real property. However, liquidation would likely take significantly longer to make the creditors whole then the proposals under the Plan. Debtor is proposing to pay all creditors 100% of their Claims.

Additionally a liquidation of property would likely result in significantly less total distribution than a reorganization under the Plan, and would likely put the Debtor out of business.

It should be noted that the creditor, Assemblies of God Loan Fund has valued the property at $6,051,200.00 in its Proof of Claim. The difference in these values will not have an actual effect on reorganization as the result of a reorganization using either value will have the same effect on creditors and would provide for all creditors to be paid in full and made whole.

THE DEBTOR FIRMLY BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF EACH CLASS OF CREDITORS AND THAT THE CREDITORS WILL RECEIVE A LARGER AND QUICKER DISTRIBUTION UNDER THE PLAN OF REORGANIZATION THAN THEY WOULD IF THE DEBTOR'S ESTATE WERE LIQUIDATED.

THE ABILITY TO REORGANIZE IS PARAMOUNT TO THE CHURCH AND IS IN THE BEST INTEREST OF THE COMMUNITY AND THE CREDITORS ALIKE. THE DEBTOR BELIEVES THERE IS SUFFICIENT EQUITY IN THE PROPERTY TO PROVIDE FOR THE CLAIMS OF ALL CREDITORS. GIVEN THE OPPORTUNITY TO RESTRUCTURE, THE DEBTOR BELIEVES THAT ALL CREDITORS WILL BE MADE WHOLE.

### VIII.   REPAYMENT PROJECTIONS

The Debtor projects that the secured Claims of Assemblies of God Loan Fund will be paid in full, albeit at a reduced interest rate, and term than was originally contracted for.   The secured Claims of Syringa Bank and Mountain West Bank (fka Glacier Bank) will be paid in full.  Assuming that all Claims are allowed, the general unsecured Claims will be paid approximately100% of their Claims.

### IX.   FEASIBILITY

The Court must find that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### A.   Ability to Initially Fund Plan

The Plan Proponent believes that the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date.

### B.  Ability to Make Future Plan Payments

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent has provided projected financial information.  Those projections are listed in Exhibit C.  The Plan Proponent's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes.

### X.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor assumes the unexpired lease of **US Bancorp Equipment Finance on** Kyocera KM-5050 Copier effective upon the date of the entry of the Order Confirming the Plan.

The Debtor does not believe that there are any current defaults on said contract, and therefore is not proposing any cure of default.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to Confirmation of the Plan, unless the Court has set an earlier time.

### XI.      TAX CONSEQUENCES

The Debtor is not qualified to advise creditors of the specific tax ramifications to them of the Confirmation of the Plan, and therefore makes no representation in this regard. However, the Debtor is not aware of any potential material federal tax consequences to creditors that would result from Confirmation of the Plan. Each creditor is urged to consult with a tax advisor as to such matters.

No material tax consequences to the Debtor are anticipated as a result of Confirmation of the Plan. Any forgiveness of indebtedness would be exempt from taxation under IRC § 108. The Debtor's Basis in the secured property will have to be adjusted, but no tax will be due as a result thereof until any such property is sold.

### XII.      MODIFICATION OR WITHDRAWALS OF THE PLAN

The Debtor may alter, amend, or modify the Plan under § 1127(a) of the Bankruptcy Code at any time before the Confirmation date, so long as the Plan, as modified, meets the requirements of §§ 1122 and 1123. The Debtor may also alter, amend, or modify the Plan under § 1127(b), following the Confirmation date but before the Effective Date. The Debtor may revoke or withdraw the Plan before the Confirmation date. If the Plan is revoked or withdrawn before the Confirmation date, the Plan shall be of no force or effect, and shall be deemed null and void. If the Plan is revoked or withdrawn before the Confirmation date, nothing contained herein shall in any way effect or prejudice the rights of the Debtor with regard to Claims, avoidance actions, or any other rights or interest. After Confirmation, the Plan may be modified pursuant to §1127(e). The payments on the Class C and the Class D Claims under the Plan for purposes of § 1127(e), such that the Plan may not be modified under §1127(e) after payment in full of Class C and D Claims.

### XIII.   OBJECTIONS TO CLAIMS, COUNTERCLAIMS, AND AVOIDANCE ACTIONS

Any objection to Claims must be filed within thirty (30) days following the Effective Date. The Debtor believes that the Claims resolution process should not delay Confirmation of the Plan. The Debtor reserves the right to file objections to any Claims, either as currently filed or as may be amended.  In order to expedite payments to creditors, the Debtor seeks Confirmation notwithstanding the fact that certain Claims may be disputed. The fact that the Debtor may have not objected to a particular Claim does not mean that the Debtor will not object to such Claim. Accordingly, the Debtor makes no representation either in the Plan or this Disclosure Statement as to the validity of any Claim filed, and creditors should not make any assumptions based upon the fact that no objection has yet been filed to any individual Claim.

The Debtor is unaware of any significant preference, fraudulent conveyance, or other avoidance actions. Therefore the Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions.

### XIV.   MISCELLANEOUS PLAN PROVISIONS

**A. Retention of Jurisdiction** - If the Bankruptcy Court Confirms the Plan, it will retain jurisdiction, as more specifically set out in the Plan, to adjudicate the

allowance of Claims, the value of secured interest, the disposition of executory contracts or unexpired leases, the avoidance of liens or transfers, litigation concerning Claims and property of the estate, rule on modifications of the Plan if any, and to issue such Orders and Judgments as may be necessary to implement the Plan and resolve disputes concerning the Plan.

        **B.  Vesting of Property in Debtor** - Upon the Effective Date of the Plan all property of the estate shall vest in the Debtor, and shall be held and owned by the Debtor, free and clear of all liens, Claims and interest of all creditors or all interest holders in the Debtor, except to the extent provided for in the Plan.

        **C.  Stay in Effect** - Pending performance of the Plan and unless the Court has otherwise expressly ordered or the Plan otherwise expressly provides, all creditors, will be stayed from proceeding against the Debtor, the Debtor's assets, or the assets of the estate.

### XV.    DISCHARGE

If the Bankruptcy Court Confirms the Plan, the Debtor will seek to have the case closed and then seek to reopen the case to receive a Discharge Order once the Plan payments are completed.

Upon Debtor's completion of all payments under the Plan, the Court shall Order a Discharge of (i) any and all Claims arising or occurring prior to the Effective Date, and (ii) any and all Claims of the kind specified in § 502(g), 502(h), or 502(i) of the Code. Such Discharge will be effective under § 1141 of the Code whether or not a Proof of Claim is filed or deemed filed, such Claim is allowed or the holder of such Claim has accepted the Plan.

### XVI.   CONCLUSION

As stated previously, the Debtor is the Proponent of the Plan and urges you to vote to accept the Plan. The information and materials provided in this Disclosure Statement are intended to assist you in voting on the Plan in an informed fashion. Since Confirmation of the Plan will be binding on your interests, the Debtor invites you to review these materials and make such further inquiries as may be appropriate.

DATED:  this 4th day of October, 2013.


/s/  Pastor Ted Buck

Pastor Ted Buck, President of Debtor


MARTELLE, BRATTON & ASSOCIATES, P.A.


/s/  Sarah B. Bratton

Sarah B. Bratton, Attorney for Debtor