Samuel A. Diddle, ISB No. 4967
David M. Swartley, ISB No. 5230
EBERLE, BERLIN, KADING, TURNBOW
& McKLVEEN, CHARTERED
1111 West Jefferson Street, Suite 530
P. O. Box 1368
Boise, ID 83701
Telephone:   (208) 344-8535
Facsimile:   (208) 344-8542

Attorneys for Assemblies of God Loan Fund

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re: | Case No. 13-00043-JPD |
| CENTRAL ASSEMBLY CHRISTIAN LIFE CENTER, | (Chapter 11) |
| Debtor. | |

### OBJECTION OF ASSEMBLIES OF GOD LOAN FUND TO ADEQUACY OF DEBTOR'S DISCLOSURE STATEMENT DATED OCTOBER 4, 2013 FOR ITS PLAN OF CONFIRMATION

Creditor Assemblies of God Loan Fund (hereinafter "Assemblies of God"), by and through its counsel of record, the law firm of Eberle, Berlin, Kading, Turnbow & McKlveen, Chartered, submits this objection to Central Assembly Christian Life Center's (hereinafter "Central Assembly") Disclosure Statement Dated October 4, 2013. Central Assembly requests that this Court approve a disclosure statement and fails to provide adequate information upon which Creditors can make an informed decision. All relevant statutory authority and prevailing case law

mandates that this Court deny approval of the Disclosure Statement. Assemblies of God therefore seeks an Order of the Court denying the approval of the Disclosure Statement.

The Disclosure Statement is the Bankruptcy Code's tool to provide Creditors with information to decide how to vote on the Plan. Fundamental to the Chapter 11 process is full and complete disclosure. *In re Brandon Mills Farms, Ltd.*, 37 B.R. 190, 192 (Bankr. N.D.Ga. 1984). Central Assembly has failed to provide the requisite information to support the approval of the Disclosure Statement and presentation of a confirmable Plan. "Where inaccuracies are so numerous or significant that creditors or interest holders can no longer make an informed judgment about whether to accept or reject the proposed plan of reorganization, approval of the Disclosure Statement must be denied." *In re Cardinal Congregate I*, 121 B.R. 760, 766-67 (Bankr. S.D.Ohio 1990); *see also In re Hirt*, 97 B.R. 981, 983 (Bankr. E.D. Wisc. 1989).

## I. FACTS RELEVANT TO ASSEMBLIES OF GOD

Assemblies of God is not a bank and is not funded or operated like a traditional bank. It is the lending and financing arm of the General Council of the Assemblies of God (hereinafter "General Council"). The General Council is an association of over 11,000 churches with over two million congregates nationwide. The General Council is a 501(c)(3) organization incorporated as a pro forma corporation under the laws of the State of Missouri. Assemblies of God is also incorporated under the laws of the State of Missouri as a not for profit corporation, organized and operated exclusively for religious and charitable purposes. The General Council has served its affiliated churches through its loan programs that are operated and managed by Assemblies of God. Assemblies of God is created specifically for the purpose of making loans to churches and institutions affiliated with the Assemblies of God, and, in pursuing that end, develops investment opportunities for members and adherents of Assembly of God churches. Dollars generated for

church lending are primarily sourced from individual investments of pastors, employees, missionaries and adherents, of General Council churches, both privately and through retirement fund investment vehicles, as well as charitable trusts and General Council-affiliated churches, institutions and schools.

Assemblies of God loaned Central Assembly the principal sum of One Million Three Hundred Seventy Thousand Dollars ($1,370,000.00) on a Promissory Note bearing a variable interest rate of 7% signed by Central Assembly, by and through its Pastor/President Ted Buck (hereinafter "Buck"), secured by a Deed of Trust on real property owned by Central Assembly, on October 25, 2005. Assemblies of God's Deed of Trust is secured against property located at: 12000 W. Fairview Ave., Boise, Idaho 83713, 1820 Dawn Drive, Boise, Idaho 83713, 5 buildings on approximately 12 acres, Lot 1 of Maranatha Subdivision, and Lot 3 of Maranatha Subdivision (hereinafter the "Property"). Pursuant to the terms and conditions of the Promissory Note the default rate on the Promissory Note obligation is 7.00%. The Promissory Note called for monthly payments to commence on November 27, 2005 and to continue each month until October 27, 2030 or until paid in full.

The Promissory Note was modified by Allonge dated August 31, 2006. At that time the principal balance of the loan was One Million Three Hundred Fifty-Four Thousand Two Hundred Twenty-Three and 83/100 Dollars ($1,354,223.83). Pursuant to the terms of the Allonge to Promissory Note, Central Assembly would make interest only payments, at 7.00%, in the amount of Seven Thousand Seven Hundred Ninety-Four Dollars ($7,794.00) commencing August 27, 2006 for a term of six months ending on January 27, 2007.

The Promissory Note was modified by a Second Allonge on October 2, 2007. At that time the principal balance of the loan was One Million Three Hundred Forty-Six Thousand Two

modification fee of Three Hundred Dollars ($300.00) added to the loan, of the loan would be due each month until paid in full.

The Promissory Note was modified by a Fifth Allonge on August 2, 2010. At that time the principal balance on the loan was One Million Three Hundred Fifty-One Thousand Eight Hundred Seventy-Three and 12/100 Dollars ($1,351,873.12). Pursuant to the terms of the Fifth Allonge to the Promissory Note, payments due on June 27, 2010 were deferred and, commencing July 27, 2010, principal and interest, at the then current rate of 7.75%, payments in the amount of Eleven Thousand Sixty-Eight and 54/100 Dollars ($11,068.54) until paid in full. The Fifth Allonge to the Promissory Note also provided that interest would be calculated by multiplying the outstanding principal balance due on that day by a daily interest factor, which daily interest fact was calculated by dividing the aforesaid per annum interest rate by the actual number of days in the calendar year.

The Promissory Note was modified by a Sixth Allonge on May 9, 2011. At that time the principal balance on the loan was One Million Three Hundred Eight-Six Thousand Six Hundred Twenty and 56/100 ($1,386,620.56). Pursuant to the terms of the Sixth Allong to the Promissory Note, commencing May 27, 2011 principal and interest, at the then current rate of 7.75%, payments in the amount of Eleven Thousand Five Hundred Six and 30/100 Dollars ($11,505.30) became due and would continue until paid in full.

Not long after the Sixth Allonge to the Promissory Note, Central Assembly made its last payment on the loan on December 19, 2011. As of April 11, 2012 the principal balance on the Promissory Note was One Million Three Hundred Ten Thousand Seven Hundred and 48/100 Dollars ($1,310,700.48) with interest accrued amounting to Fifty-Seven Thousand Sixty-One and 94/100 ($57,061.94) and late charges of One Thousand Seven Hundred Twenty-Five and 96/100

Hundred Eighty and 97/100 ($1,346,280.97). Pursuant to the terms of the Second Allonge to Promissory Note, payments due July 27, 2007 and August 27, 2007 were deferred, all interest and late fees were added to the principal balance of the loan, including the Three Hundred Dollar ($300.00) modification fee, and beginning on September 27, 2007 Central Assembly would make monthly installment payments of principal and interest in the amount of Nine Thousand Nine Hundred Twenty-Three and 00/100 ($9,923.00) until paid in full.

The Promissory Note was modified by a Third Allonge on June 17, 2008. At that time the principal balance on the loan was One Million Three Hundred Forty-Five Thousand Seven Hundred Ninety-Four and 41/100 Dollars ($1,345,794.41). Pursuant to the terms of the Third Allonge to the Promissory Note, monthly payments due June 27, 2008 and August 27, 2008 were deferred with any accrued unpaid interest added to the principal loan, and Central Assembly was to make monthly installments of principal and interest based upon the new principal balance of the loan at lender's current rate, 7.00%, beginning on September 27, 2008 until paid in full.

The Promissory Note was modified by a Fourth Allonge on March 25, 2009. At that time the principal balance on the loan was One Million Three Hundred Fifty-Nine Thousand Three Hundred Three and 49/100 ($1,359,303.49). Pursuant to the terms of the Fourth Allonge to Promissory Note, monthly installment payments of Five Thousand Five Hundred and 00/100 Dollars ($5,500.00) were due beginning February 27, 2009 and continued for three months to April 27, 2009. Further, interest only payments in the amount of Eight Thousand Four Hundred Ninety-Seven and 53/100 ($8,497.53) commenced on May 27, 2009 and were to continue for a term of six months to October 27, 2009. Commencing November 27, 2009, principal and interest, at the then current rate of 7.5%, payments based on the new principal balance, with all unpaid interest and the

($1,725.96). Assemblies of God commenced non-judicial foreclosure proceedings shortly thereafter. The instant bankruptcy followed.

To date, no payments whatsoever have been received from Central Assembly since December 2011.

## II. LEGAL ARGUMENT

### A. The Debtor's Disclosure Statement Fails to Provide "Adequate Information," as Required by Section 1125 of the Bankruptcy Code.

The confirmation process is premised, in large part, upon the mandate of Section 1125 that all creditors and equity holders of a debtor be provided with information regarding the debtor and any proposed plan of reorganization. Specifically, Section 1125(b) of the Bankruptcy Code provides that approval of the proposed plan may not be solicited unless, or prior to such solicitation, a written disclosure statement, approved by the Bankruptcy Court as containing "adequate information," has been provided to such claimant or interest holder. The very purpose of a disclosure statement is to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of the plan. *In re California Fidelity, Inc.*, 198 B.R. 567, 571 (9th Cir.BAP 1996). Therefore, the courts have found that the disclosure of information occupies a "paramount position" in the confirmation process. *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). Whether a disclosure statement contains the requisite information must be decided on a case-by-case basis, upon an examination of all relevant facts. *In re Applegate Property, Ltd.*, 133 B.R. 837, 829 (Bankr. W.D.Tex. 1991); *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D.Minn. 1989).

To assist in evaluating the adequacy of disclosure, courts have developed the following non-exclusive list of the type of information a disclosure statement must contain;

    (a)    The circumstances that gave rise to the filing of the bankruptcy petition;

(b) A complete description of the available assets and their value;

(c) The anticipated future of the debtor;

(d) The source of information provided in the disclosure statement;

(e) A disclaimer, which typically indicates that no statement or information concerning the debtor or its assets are authorized, other than those set forth in the disclosure statement;

(f) The condition and performance of the debtor while in Chapter 11;

(g) Information regarding claims against the estate;

(h) A liquidation analysis;

(i) The accounting and valuation methods used to produce the financial information in the disclosure statement;

(j) Information regarding the future management of the debtor, including amount of compensation to be paid to any insiders, directors, and/or officers of the debtor;

(k) A summary of the plan of reorganization;

(l) An estimate of all administrative expenses, including attorneys' fees and accountants' fees;

(m) The collectability of any accounts receivable;

(n) Any financial information, valuations or *pro forma* projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

(o) Information relevant to the risks being taken by the creditors and interest holders;

(p) The actual or projected value that can be obtained from avoidable transfers;

(q) The existence, likelihood and possible success of non-bankruptcy litigation;

(r) The tax consequences of the plan; and

(s)    The relationship of the debtor with affiliates.

*In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); *In re Dakota Rail, Inc.*, 104 B.R. 138, 142 (Bankr. D. Minn. 1989); *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988); *In re S.E.T. Income Properties, III*, 83 B.R. 791, 792 (Bankr. N.D. Okl. 1988); and *In re Metrocraft Publishing Serv., Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984).

Here, Central Assembly's Disclosure Statement fails to provide fundamental, accurate information necessary to make an informed decision regarding whether to accept or reject the Plan and hence must not be approved.

**1.    The Disclosure Statement Lacks Information Concerning Methodology Used in Valuing the Property.**

*In re Scioto Valley*, 88 B.R. 168 (Bankr. E.D. Ohio 1988), lists as one category of required disclosures, "any financial information, valuations or *pro forma* projections that would be relevant to creditors' determination of whether to accept or reject the plan." Courts have denied the approval of disclosure statements where real property valuations contained therein lack factual basis. *In re Reilly*, 71 B.R. 132, 135 (Bankr. D. Mont. 1987).

As of the date of the Voluntary Petition for relief under Chapter 11 of the Code on January 10, 2013, Assemblies of God was owed the sum of One Million Four Hundred Eighty-One Thousand Three Hundred Three and 57/100 Dollars ($1,481,303.57) on its Promissory Note secured by the Deed of Trust on the Property. Assemblies of God filed a Proof of Claim in the amount of One Million Four Hundred Eighty-One Thousand Three Hundred Three and 57/100 Dollars ($1,481,303.57) based on an appraised value of the Property of Six Million Fifty-One Thousand Two Hundred and 00/100 ($6,051,200.00).

Here, the Disclosure Statement does not include an appraisal of the Property. Central Assembly merely provides estimates of its own self-serving value of the Property. There is no

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C Section 1129(a)(11).

The Debtors anticipate the feasibility test at Section IX, page 20 of the Disclosure Statement. With respect to the ability to initially fund the Plan, Central Assembly asserts only that it will have enough cash on hand on the effective date of the Plan to pay all Claims and expenses that are due on that date. The problem is that the Monthly Operating Reports (hereinafter "MORs") submitted by the Debtor demonstrate that historically Central Assembly has not maintained adequate operating income such that it would have the ability to initially fund the Plan. In January, 2013, the month in which the Voluntary Petition was filed, Central Assembly's operating income was $19,648.38. The next month, February, it was $1,859.00. In March the operating income of Central Assembly was $1,982.00. In April the Debtor was operating at a loss of $1,272.00. The following month it operated at a greater loss of $8,032.00. June was more kind to Central Assembly as its operating income was $11,460.00. However, in July, it operated at a loss of $9,172.00. Central Assembly rebounded somewhat in August with operating income of $3,889.00. But in September, the most recent month in which a MOR was submitted, Central Assembly operated at a loss of $6,685.00.

Since the filing of its Petition in January, Central Assembly has had adequate cash on hand to adequately fund the Proposed Plan twice: in January, right after filing its Petition, and in June. In the other months in which its operating income was in the black, February, March and August, there was not enough cash on hand to initially fund the Plan. The Debtor's financial condition does not instill much confidence that it will have the cash on hand to fund the Plan and the Disclosure Statement fails to provide adequate information that, in fact, Central Assembly will have that cash.

**OBJECTION OF ASSEMBLIES OF GOD LOAN FUND TO ADEQUACY OF DEBTOR'S DISCLOSURE STATEMENT DATED OCTOBER 4, 2013 FOR ITS PLAN OF CONFIRMATION - 10**
12014-1/00463850.000

information regarding the methodology or process used at arriving at the value. Debtor simply states that the Property should be valued at $3,865,050.00 based on Central Assembly's own "best estimate" relying on current tax assessments and real estate comparisons. This is not sufficient evidence for creditors to accurately determine the value of the Debtor's assets, including the Property. Assemblies of God therefore objects to Central Assemblies valuation of the Property as set out in its Disclosure Statement.

### 2. There is No Discussion of Marketing or Ability to Sell

Beyond stating that the Debtor is currently marketing the Property to sell through a real estate agent previously provided by the Court, there is no analysis or discussion of the likelihood that Central Assembly's Property can be sold within the time frame contemplated under the Plan. Assemblies of God was informed by Debtor that in the last five years the Property had two interested buyers which ultimately did not work out, but no other interest. Since the Court approved the real estate agent on June 12, 2013 there has been no serious interest in the Property. There is absolutely nothing which suggests that the Property has any reasonable chance of sale during this current market or any time in the future. There is no discussion of marketing efforts which are to be used or what efforts differing from unsuccessful effort of the past which will in fact work. The failure to disclose makes it impossible for a reasonable Creditor to evaluate the situation and the likelihood of success.

### 3. The Disclosure Statement Provides Inadequate Information Regarding Feasibility of the Plan

Pursuant to Section 1129 of the Bankruptcy Code, the Court may not confirm the Plan if the Debtor fails to prove that the Plan is feasible. In this regard, Section 1129(a)(11) provides, in relevant part, that a court may confirm a plan only if:

Central Assembly then discloses that it has provided projected financial information which shows that it will have enough cash over the life of the Plan to make the required Plan payments. This projected financial information is, according to the Debtor, listed in Exhibit C. There is no Exhibit C attached, although that may have been a typographical error by the Debtor and Exhibit B was meant to be referenced. But even the numbers on Exhibit B are dubious.

The figures which Central Assembly submits for its projected Income and Expenses appear charitable. The Expenses remain constant, for the most part, throughout the year. The Income, however, is a different story. The numbers varying wildly from the numbers provided in the MORs submitted by the Debtor to Court. For instance, in February 2013, the Debtor's income from Offerings was $30,342. In February 2014, Central Assembly projects Offerings of $51,000. Why such a large discrepancy between the two years? For that matter, why such a large difference between January 2014 projected Offerings ($37,000), March 2014 projected Offerings ($26,000) with the projected Offerings of February 2014 ($51,000)? Not only are the Offerings projections wildly different from the actual Offerings received in 2013, but the Preschool, MCS, Love Center, Sonshine Day Camp, Designated and Miscellaneous projected income for 2014 is also considerably different from those actually received in 2013. There is no explanation of the accounting and valuation of these projected numbers in order that the creditors can have adequate information to make an informed decision regarding the Plan.

These projected income figures are based on a best case scenario for Central Assembly. The projected income figures for 2014, for each month from each source of income, in almost every entry the projection is considerably higher than that which was attained this past year by the Debtor. Central Assembly does not explain how it arrived at these figures or the methodology used in calculating these numbers. Moreover, the projected numbers also do not vary dramatically from

month to month as the income figures do 2013. These differences are a cause for concern and raise the question of whether the Plan of Reorganization as proposed by the Debtor is even remotely realistic.

Courts require that disclosure statements provide information concerning how the debtor intends to make the payments anticipated under the plan. *In re Scioto Valley*, 88 B.R. at 172 (requiring that disclosure statement provides "more detailed information concerning the Debtor's ability to make payments proposed in the plan."); *In re Microwave Products of America, Inc.*, 100 B.R. 376, 378 (Bankr. W.D. Tenn. 1989) (denying approval of disclosure statement when it failed to contain financial information concerning the funding of the reorganized debtor); *In re Cardinal Congregate I*, 121 B.R. 760, 767 (Bankr. S.D. Ohio 1990) ("Where, as here, the satisfaction of claims and interests is dependent upon the debtor's ability to improve its financial performance or to consummate contemplated transactions, it is not overly demanding for the Court to require detailed disclosure of the facts and assumptions underlying the debtor's belief that it will accomplish its reorganization effort"); *In re Unichem Corp.*, 72 B.R. 95, 97-98 (Bankr. N.D. Ill. 1987) (finding disclosure statement did not contain adequate information when it was unclear whether or under what conditions debtor principal would be required to make equity infusion to fund plan).

There is a dearth of information concerning the Debtor's ability to fund the Plan initially and its ability to make future Plan payments. This raises concerns about the amount of information being provided to creditors to enable them to access the feasibility and likelihood of the Debtor's method of funding the Plan and the feasibility of the Plan. At a minimum, Central Assembly should be required to provide more background information concerning the assumptions and

methodology behind the projections and should provide projections for period of time anticipated by the Disclosure Statement. This Disclosure Statement should be denied by the Court.

### 4. The Disclosure Statement Lacks Adequate Information Regarding the Liquidation Analysis and Best Interests of Creditors Test

Central Assembly also addresses the "Best Interests Test" and Liquidation at Section VII, pages 18-20 of the Disclosure Statement. There the Debtor concludes, without any analysis, that each class of creditors will receive a larger and quicker distribution under the Plan than they would if the estate was liquidated through Chapter 7. Estimating that various fees and costs of liquidation would reduce the amount of funds in the estate for distribution by 25%, Central Assembly concludes that liquidation is worse than reorganization, asserting that liquidation would "likely take significantly longer to make creditors whole then (sic) the proposals under the Plan." This is the exact opposite of how a Chapter 7 liquidation is supposed to work.

To the best of Assemblies of God's knowledge, all of the assets of the estate are located in the same place. Therefore, the Chapter 7 trustee would have very little work to do to recover assets for the benefit of the estate. Beyond making a wild guess that fees and costs of liquidation of the estate would reduce the amount of funds for distribution by 25%, there is no analysis or information that supports that this is accurate. The only information which the Debtor provides in its Disclosure Statement regarding the costs of liquidation which would result in funds for distribution "is based upon the Debtor's counsel consulting with individuals including the Debtor." That is hardly adequate information. Who are these "individuals"? What information does the Debtor have that would assist in projecting the liquidation costs?

There is not adequate information regarding the liquidation analysis and Best Interests of Creditors Test in the Disclosure Statement for creditors to make an informed decision regarding the Plan. Therefore, the Disclosure Statement should be denied.

OBJECTION OF ASSEMBLIES OF GOD LOAN FUND TO ADEQUACY OF DEBTOR'S DISCLOSURE STATEMENT DATED OCTOBER 4, 2013 FOR ITS PLAN OF CONFIRMATION - 13
12014-1/00463850.000

**B.     The Disclosure Statement Should not be Approved Because the Plan is Patently Unconfirmable.**

The Disclosure Statement should not be approved because the Plan is patently unconfirmable as a matter of law. It is well-established that a disclosure statement relating to a plan that is facially defective cannot be approved as containing "adequate information" within the confines of section 1125 of the Bankruptcy Code. In other words, "[i]f the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures." *Eastern Maine Elec. Coop.* 125 B.R. 329, 333 (Bankr. D. Me. 1991); *see also In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003); *In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("[N]ot withstanding adequate disclosure of information required by section 1125(b), a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed.") (citations omitted); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("A disclosure statement will not be approved where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation."); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) (analysis of such issues at this stage of the confirmation process has become a "standard Chapter 11 practice").

The primary reason to evaluate confirmability at the disclosure statement stage is to "avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on the plan when the plan is unconfirmable on its face. Such an exercise in futility only serves to further delay a debtor's attempts to reorganize." *In re Atlanta West VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

1. **The plan is unconfirmable because the interest rate proposed in the plan is below market**

The Plan fails to provide uniform treatment of all secured creditors. Central Assembly proposes creditors Syringa Bank and Mountain West Bank, designated as Class C secured creditors on personal property in the Disclosure Statement, receive 6.00% and 6.50% interest respectively on their secured loans. In contrast, Central Assembly proposes interest only payments on the total outstanding amount of Assembly of God's loan for five years with an interest rate of 1% the first year, 2% the second year, 3% the third year, 4% the fourth year and 5% the fifth year, the final year which Debtor expects the loan to be paid in full under this Plan. While interest rate battles typically are reserved for a confirmation hearing, at the disclosure statement phase there should be some limits to a debtor's wishful thinking. The Plan is not confirmable and the Disclosure Statement cannot be approved.

The Debtor's proposed interest rates of one, two and three percent are well below market given Central Assembly's business plan and the state of financial and real estate markets. The prime rate of interest (hereinafter "Prime Rate") is currently 3.25% and Central Assembly is not a borrower credit worthy of a prime rate. Without conceding that the methodology of adjusting off of the Prime Rate is correct, nonetheless two recent interest rate cases found fair and equitable interest rates to be Prime Rate plus 2% (with amortization) and Prime plus 5% (proposed amortization unnecessary since plan deemed unconfirmable). *In re Cypress Creek Assisted Living Residence, Inc.*, Case No. 08-19481 (M.D. Fla. Williamson, J.)(Hr'g August 20, 2009), and *In re Griswold Building, LLC*, Case No. 09-57520 (E.D. Mich., Shefferly, J.) (Dec., Dec. 12th, 2009).

Central Assembly does not provide adequate information regarding its methodology or valuation in determining the extremely low interest rate it proposes under the Plan to Assembly of God. There is no explanation as to how it arrived at using these interest rate percentages. There is

also no explanation as to why the only other secured creditors are treated more favorably with their interest rates than Assemblies of God is treated. Central Assembly is proposing interest only payments for five years and then re-amortizing after five years. The Debtor does not provide any rationale or basis for using these interest rates and for re-amortizing after five years of interest only payments. Central Assembly's Disclosure Statement should be denied.

### III. CONCLUSION

For the reasons stated herein, Creditor Assemblies of God Loan Fund respectfully requests this Court deny the Debtor's Disclosure Statement.

DATED October 29th, 2013.

                                        EBERLE, BERLIN, KADING, TURNBOW,
                                        & MCKLVEEN, CHARTERED

                                        By_____
                                        David M. Swartley, of the firm
                                        Attorneys for Creditor, Assemblies of God Loan
                                        Fund

Internal Revenue Service
Department of the Treasury
Ogden, UT 84201-0010

Ken Snodgrass
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

Linda Buck
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

Michelle Rowe
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

Mountain West Bank
802 W. Bannock Street, Suite 1100
Boise, ID 83702

Nampa Meridian Irrigation
1503 First Street South
Nampa, ID 83651

Nancy Smith
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

Nathan Devore
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

Philadelphia Insurance Co.
PO Box 70251
Philadelphia, PA 19176-0251

Ramona Twaddle
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

OBJECTION OF ASSEMBLIES OF GOD LOAN FUND TO ADEQUACY OF DEBTOR'S DISCLOSURE
STATEMENT DATED OCTOBER 4, 2013 FOR ITS PLAN OF CONFIRMATION - 18
12014-1/00463850.000

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of September, 2013, I electronically filed the foregoing MOTION TO DISMISS with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Sarah B. Bratton sarah@martellelaw.com

Sam A. Diddle sdiddle@eberle.com

Richard W. Sweney rws@lukins.com

United States Trustee ustp.region18.bs.ecf@usdoj.gov

AND, I HEREBY CERTIFY that I have served the foregoing document to the following non-CM/ECF Registered Participants **via U.S. Mail** (list names and addresses):

Central Assembly Christian Life Center
12000 W. Fairview Ave.
Boise, ID 83713

AA Landscaping
6835 W. Elder Street
Boise, ID 83709

AA Sanitation Service LLC
5641 Cascade Road
Emmett, ID 83617

Barbara Elizondo
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

Delta Dental
Bank Lockbox Processing
PO Box 271372
Salt Lake City, UT 84127-1372

Donna Spets
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

**OBJECTION OF ASSEMBLIES OF GOD LOAN FUND TO ADEQUACY OF DEBTOR'S DISCLOSURE STATEMENT DATED OCTOBER 4, 2013 FOR ITS PLAN OF CONFIRMATION - 17**
12014-1/00463850.000

Ryan Shervik
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

Sharon White
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

Ted Buck
c/o Central Assembly
12000 W. Fairview Ave.
Boise, ID 83713

/s/
David M. Swartley